## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**TRACIE HOLMES,** individually, and on
behalf of others similarly situated,

      Plaintiffs,

vs.

      Case No. 16-13164

**KELLY SERVICES USA, LLC,**
a Michigan limited liability company, **KELLY
SERVICES, INC**., a Delaware corporation, and
**HEALTH NET FEDERAL SERVICES, LLC,** a
Delaware limited liability company,

      Defendants.

---

SEYFARTH SHAW, LLP

By:  /s/ Gerald L. Maatman, Jr.

Gerald L. Maatman, Jr., IL #6181016
gmaatman@seyfarth.com
Peter J. Wozniak, IL #6294133
pwozniak@seyfarth.com
SEYFARTH SHAW LLP
233 S Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
Phone:          (312) 460-5000
Facsimile:     (312) 460-7000

*Attorneys for Defendants Kelly Services USA,
LLC and Kelly Services, Inc.*

KIENBAUM OPPERWALL HARDY &
PELTON, P.L.C.

By:  /s/ William B. Forrest III

William B. Forrest III
wforrest@kohp.com
Kienbaum Opperwall Hardy & Pelton,
P.L.C.
280 North Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
Phone:  248-645-0000
Fax:  248-723-1110

*Attorney for Defendants Kelly Services USA,
LLC and Kelly Services, Inc.*

---

### DEFENDANT KELLY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RENEWED PRE-DISCOVERY MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE TO POTENTIAL OPT-IN PLAINTIFFS PURSUANT TO 29 U.S.C. § 216(b)

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PROCEDURAL BACKGROUND ...................................................................... 2

FACTUAL BACKGROUND ............................................................................. 3

    A.    Holmes' Employment History At The Health Net Facility .................... 3

    B.    Holmes Admits Her Declaration Is Inaccurate ...................................... 5

    C.    Holmes Admits Her Lack Of Knowledge About Other Agents ............ 6

ARGUMENT ...................................................................................................... 7

    A.    Holmes' Declaration Lacks A Sufficient Basis .................................. 10

        1.    Holmes' Assertions Are Not Based On Personal Knowledge ................. 11

        2.    Holmes' Assertions Are Based On Inadmissible Hearsay........................ 16

        3.    Holmes Only Worked During A Small Portion Of The Collective Action Period ................................................................ 19

    B.    Price's Email Does Not Demonstrate A Facility-Wide Policy............................. 19

    C.    Holmes Has Not Demonstrated A "Policy-To-Violate" Kelly's Lawful Policy .......................................................................... 21

    D.    The Proposed Collective Is Unmanageable ....................................... 24

CONCLUSION................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adair v. Wis. Bell, Inc.*,
  No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008)................................................24

*Arrington v. Michigan Bell Tel. Co.*,
  No. 10-10975, 2011 WL 3319691 (E.D. Mich. Aug. 1, 2011)........................................8, 9, 15

*Cason v. Vibra Healthcare*,
  No. 10-10642, 2011 WL 1659381 (E.D. Mich. May 3, 2011) .........................................3, 7, 8

*Chalker v. Burlington Coat Factory of Fla., LLC*,
  No. 8:12-CV-2755, 2013 WL 5954783 (M.D. Fla. Nov. 7, 2013) ........................................24

*Combs v. Twins Grp., Inc.*,
  No. 3:16-CV-295, 2016 WL 7230854 (S.D. Ohio Dec. 14, 2016)........................................19

*Freeman v. Easy Mobile Labs, Inc.*,
  No. 1:16-CV-00018, 2016 WL 4479545 (W.D. Ky. Aug. 24, 2016) .......................................2

*Frye v. Baptist Mem'l Hosp., Inc.*,
  No. 07-2708, 2008 WL 6653632 (W.D. Tenn. Sept. 16, 2008) .............................................8

*Gaffers v. Sitel Worldwide Corp.*,
  No. 3-16-0128, 2016 WL 3137726 (M.D. Tenn. June 6, 2016) .............................................8

*Goldfaden v. Wyeth Labs., Inc.*,
  No. 08-10944, 2010 WL 2011310 (E.D. Mich. May 19, 2010), *aff'd*, 482 F.
  App'x 44 (6th Cir. 2012) ....................................................................................................16

*Gromek v. Big Lots, Inc.*,
  No. 10-CV-4070, 2010 WL 5313792 (N.D. Ill. Dec. 17, 2010)........................................8, 25

*Harrison v. McDonald's Corp.*,
  411 F. Supp. 2d 862 (S.D. Ohio 2005) ........................................................................8, 9, 17

*Hawkins v. Alorica, Inc.*,
  287 F.R.D. 431 (S.D. Ind. 2012).....................................................................18, 20, 21, 23

*Jones v. Xerox Commercial Solutions, LLC.*,
  No. 4:13-CV-650, 2013 WL 5945652 (S.D. Tex. Nov. 6, 2013) ...........................................23

*Langlands v. JK & T Wings, Inc.*,
  No. 15-13551, 2016 WL 4073548 (E.D. Mich. Aug. 1, 2016).......................................3, 8, 16

*MacGregor v. Farmers Ins. Exch.*,
  No. 10-CV-3088, 2011 WL 2981466 (D.S.C. July 22, 2011) ...................................................24

*Moeck v. Gray Supply Corp.*,
  No. 03-1950, 2006 WL 42368 (D.N.J. Jan. 6, 2006)..................................................................24

*O'Neal v. Emery Federal Credit Union*,
  No. 1:13–CV–22, 2013 WL 4013167 (S.D. Ohio Aug. 6, 2013) ........................................9, 10

*Pacheco v. Boar's Head Provisions Co., Inc.*,
  671 F. Supp. 2d 957 (W.D. Mich. 2009) ...............................................................8, 21, 22, 23

*Perry v. Randstad General Partner (US) LLC*,
  No. 14-11240, 2015 WL 2237829 (E.D. Mich. May 12, 2015) .................................................8

*Richardson v. Wells Fargo Bank, N.A.*,
  No. 4:11-CV-00738, 2012 WL 334038 (S.D. Tex. Feb. 2, 2012) .....................................24, 25

*Saleen v. Waste Management, Inc.*,
  No. 08-CV-4959, 2009 WL 1664451 (D. Minn. June 15, 2009).........................................7, 22

*Shipes v. Amurcon Corp.*,
  No. 10-14943, 2012 WL 995362 (E.D. Mich. Mar. 23, 2013) ........................................8, 9, 10

*White v. MPW Indus. Servs.*,
  236 F.R.D. 363 (E.D. Tenn. 2006)...........................................................................................10

## Statutes

29 U.S.C. § 216(b) ................................................................................................... *passim*

## ISSUES PRESENTED

1.      Has Plaintiff met her burden of submitting sufficient evidence to establish at least a colorable basis for her claim that a collective of similarly situated plaintiffs exists?

*Suggested Answer:  No.*

2.      Has Plaintiff met her burden of showing that this case is manageable as a collective action and that she is an adequate representative of the putative collective?

*Suggested Answer:  No.*

## <u>CONTROLLING/MOST APPROPRIATE AUTHORITY</u>

**Page(s)**

**Cases**

*Arrington v. Michigan Bell Tel. Co.*,
    No. 10-10975, 2011 WL 3319691 (E.D. Mich. Aug. 1, 2011)......................................8, 9, 15

*Cason v. Vibra Healthcare*,
    No. 10-10642, 2011 WL 1659381 (E.D. Mich. May 3, 2011) .........................................3, 7, 8

*Goldfaden v. Wyeth Labs., Inc.*,
    No. 08-10944, 2010 WL 2011310 (E.D. Mich. May 19, 2010), *aff'd*, 482 F.
    App'x 44 (6th Cir. 2012) ...................................................................................................16

*Langlands v. JK & T Wings, Inc.*,
    No. 15-13551, 2016 WL 4073548 (E.D. Mich. Aug. 1, 2016)......................................3, 8, 16

*Shipes v. Amurcon Corp.*,
    No. 10-14943, 2012 WL 995362 (E.D. Mich. Mar. 23, 2013) ......................................8, 9, 10

*Pacheco v. Boar's Head Provisions Co., Inc.*,
    671 F. Supp. 2d 957 (W.D. Mich. 2009) ..............................................................8, 21, 22, 23

*White v. MPW Indus. Servs.*,
    236 F.R.D. 363 (E.D. Tenn. 2006).........................................................................................10

*Saleen v. Waste Management, Inc.*,
    No. 08-CV-4959, 2009 WL 1664451 (D. Minn. June 15, 2009).......................................7, 22

# INTRODUCTION

This case began when Plaintiff Tracie Holmes ("Plaintiff" or "Holmes") claimed to have knowledge of a nationwide scheme to deny workers employed by Kelly at brick-and-mortar call centers compensation for pre-shift and post-shift work.[1] After the Court expressed skepticism regarding the foundation for such far-reaching knowledge, Plaintiff then claimed that she only had knowledge of such a scheme at the call center where she was employed for less than eight months, and in her motion presents no evidence regarding the time before or after her tenure. Then, at her deposition, she narrowed her claimed knowledge further still, foreswearing any knowledge regarding the vast majority of call center workers at that single location.

Indeed, setting aside the numerous inaccuracies uncovered during her deposition, Plaintiff made clear that she only claims to have knowledge regarding a tiny fraction of the call center workers Kelly employs at the Hampton, Virginia, facility. Specifically, Holmes' knowledge is limited to a single team supervised by LaTanya Price. Nine days before Kelly terminated Plaintiff, Price sent an email about arrival, departure, and timekeeping to Plaintiff and the few other members of her team – all night shift workers who sat on Plaintiff's floor. Price's email directly contradicted Kelly's written time-entry policy, and is the basis for Plaintiff's arguments regarding the existence of a group of similarly situated individuals.

Despite seeking to represent them in a collective action, Plaintiff admitted that she knows *nothing* about: employees who worked on different programs; employees who worked on other shifts; employees who worked on a different floor; and employees who worked on different

---

[1] Holmes initially sought a putative nationwide FLSA collective consisting of brick-and-mortar call center agents nationwide. (ECF No. 5 at 16.) In support, Holmes submitted a declaration asserting "that all of [Kelly's] hourly Agents are subject to the same practices and procedures . . . ." (*See* ECF No. 5-2 ¶ 20.) Confirming the Court's suspicion that Holmes lacks a basis to make such a broad assertion, *see* Maatman Decl. ¶ 3, Ex. 1, Nov. 29 Hrg. Tr. at 41:14-24, Holmes admitted at her deposition that she knows nothing whatsoever about agents at other call centers. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 40:20-41:1.)

1

teams.  Accordingly, neither Price's e-mail – sent to only a tiny fraction of the individuals in the collective action that Plaintiff seeks to conditionally certify – nor Plaintiff's testimony or assertions supports certification of the putative collective action that Plaintiff seeks to represent. Holmes presents her individual claim, and nothing else.  The Court should deny Plaintiff's renewed motion for conditional certification.

## PROCEDURAL BACKGROUND

On September 1, 2016, Plaintiff filed the original Complaint, and on September 15, 2016, Plaintiff filed a "Pre-Discovery" Motion for Conditional Certification.  (ECF Nos. 1, 5.) Plaintiff's Motion For Conditional Certification sought to conditionally certify a FLSA collective action consisting of, and authorize issuance of notice to, all current and former hourly brick-and-mortar call center agents who worked for Kelly, nationwide.  (ECF No. 5 at 16.)

On November 29, 2016, the Court conducted a hearing on three then-pending motions filed by Kelly, including a Motion To Compel Arbitration, ECF No. 14.[2]  At the hearing, the Court expressed "concerns" and "questions" about whether Plaintiff's Motion For Conditional Certification could satisfy the standard for certifying a collective action under Section 216(b). (Maatman Decl. ¶ 3, Ex. 1, Nov. 29 Hrg. Tr. at 40:14-17; 43:11-13.)  The Court expressed further concern that the assertions in Holmes' supporting declaration lacked foundation, especially Holmes' assertion that she "know[s] that all of the defendant's hourly agents are subjected to the same practices and procedures."  (*Id*. at 41:14-24.)  The Court offered Plaintiff the opportunity to provide additional declarations to attempt to address the Court's concerns. (*Id*. at 42:6-10.)  Counsel for Plaintiff explained that they "can certainly submit a supplemental

---

[2] The Court took Kelly's Arbitration Motion under advisement.  (ECF No. 29.)  Courts within the Sixth Circuit have declined to rule on, or have denied, motions for conditional certification, when, as here, the only plaintiff's claims are subject to arbitration. *See, e.g.*, *Freeman v. Easy Mobile Labs, Inc*., No. 1:16-CV-00018, 2016 WL 4479545, at *2 (W.D. Ky. Aug. 24, 2016).

declaration", and that they had "been contacted by several other people, and we can certainly submit declarations from those people as well." (*Id.* at 42:11-17.)

On December 19, 2016, Plaintiff filed a First Amended Complaint, adding Health Net Federal Services, LLC as a Defendant, and narrowing the proposed FLSA collective action to Agents who worked at the Health Net Facility. (ECF No. 34 ¶ 45.) On January 20, 2017, Plaintiff filed a Renewed Motion for Conditional Certification. (ECF No. 40.) Plaintiff's Renewed Motion For Conditional Certification seeks to conditionally certify a FLSA collective action consisting of "[a]ll current and former hourly brick-and-mortar call center agents who worked for Defendants in Health Net Federal Services, LLC's Hampton, Virginia call center at any time in the last three years." (ECF No. 40. at 1.) Despite assuring the Court that Plaintiff would "submit additional declarations from *other employees, at least one employee, if not more*," *see* Maatman Decl. ¶ 3, Ex. 1, Nov. 29 Hrg. Tr. at 45:24-25 (emphasis added), the Renewed Motion is again supported only by a Supplemental Declaration ("Declaration") from Holmes.[3]

## FACTUAL BACKGROUND

### A.    Holmes' Employment History At The Health Net Facility

Kelly provides a broad array of outsourcing and consulting services as well as world-class staffing on a temporary, temporary-to-hire, and direct-hire basis. (ECF No. 34 ¶ 2.) Kelly provides and manages employees at client facilities, including the Health Net Federal Services, LLC ("Health Net") facility in Hampton, Virginia ("Health Net Facility"). (Walker Decl. ¶ 6.)

Holmes was employed from August 10, 2015, through March 31, 2016, as a Contact Center Customer Service Agent ("Agent") at the Health Net Facility. (*Id.* ¶ 8; ECF No. 40-3 ¶

---

[3] "In *Cason*, the court noted that it is not aware of a single case in which conditional certification was granted based on the allegations of a single employee." *Langlands v. JK & T Wings, Inc.*, No. 15-13551, 2016 WL 4073548, at *4 (E.D. Mich. Aug. 1, 2016) (citing *Cason v. Vibra Healthcare*, No. 10-10642, 2011 WL 1659381, at *3 n.3 (E.D. Mich. May 3, 2011)).

3.)  Agents at the Health Net Facility worked on different programs, including the "VA Program," which Holmes worked on, and the "Tri-Care Program," which she did not. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 28:19-29:3; 29:14-23.)  Holmes was responsible for outbound calls to medical providers and patients – U.S. military veterans – to arrange medical appointments and to solicit feedback from patients about their appointments.  (Walker Decl. ¶ 6; ECF No. 40-3 ¶ 4.)

During the putative collective action period, Kelly employed approximately 550 people as Agents at the Health Net Facility, employing between 74 and 198 at any given time.  (Walker Decl. ¶¶ 10, 11.)  Kelly's Agents at the Health Net Facility worked on discreet teams, each of which was headed by one Supervisor.  (*Id.* ¶ 11.)  Some Supervisors are Kelly employees, and others are Health Net employees.  (*Id.* ¶ 7.)  During Holmes' employment (and until December 2016), Agents at the Health Net Facility worked either on the day shift or the night shift.  (*Id.* ¶¶ 12, 14.)  There is no longer a night shift.  There were four night shift teams and five or six day shift teams, each of which had one Supervisor.  (*Id.* ¶ 13.)  Certain teams worked "upstairs" at the Health Net Facility, and others worked "downstairs."  (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 33:25-34:6.)  Holmes only worked on the night shift, and only "upstairs." (*Id.* at 30:23-31:1; 33:25-34:6.)

Price was Holmes' supervisor.  (*Id.* at 32:17-21.)  Price was employed from August 17, 2015 through June 6, 2016.  (Walker Decl. ¶ 9.)  In her Declaration, Holmes mentions three other Agents.  (Holmes Decl. ¶ 22.)  Jocelyn Wright[4] and Elonda Burrell worked under Price on the same night shift team as Holmes.  (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 89:22-25; 90:1-6.)  Ruth Curtis also worked on the night shift, but on a "downstairs" team under a different

---

[4] Holmes' Declaration refers to "Jocelyn White."  Kelly never employed anyone by that name at the Health Net Facility, but had an employee named "Jocelyn Wright." (Walker Decl. ¶ 25.)

supervisor.  (Walker Decl. ¶ 14; Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 88:1-10.)

### B.    Holmes Admits Her Declaration Is Inaccurate

Holmes testified about numerous critical inaccuracies in her Declaration.  For example, Holmes' motion ultimately depends in large part on her allegation that Kelly "trained and directed" her to arrive 10 minutes early to start her log-in procedures.  However, in addition to numerous other inaccuracies Holmes admitted at her deposition, she confirmed that this central allegation was not a requirement at all, but merely a suggestion. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 45:19-25 ("No, we weren't required, but it was suggested that we arrive early to be prepared to start when our shift starts"); *id.* at 52:4-9; 57:11-21.)

Moreover, Holmes admitted that she was also *not* required to perform certain of the log-on tasks described in her Declaration. For instance, she admitted that she was not required to "[o]rganize programs in a manageable way" prior to starting her shift, despite asserting in her Declaration that this is a requirement.  (*Id.* at 55:24-25; 56:1-6.)  Holmes also admitted that, contrary to the assertion in her Declaration, she was required to do so "prior to each shift," she could review email updates *after* her shift began.  (*Id.* at 64:6-10.)  Moreover, Holmes admitted that the asserted pre-shift task of powering on her computer happened "maybe once a week," because Agents were instructed not to power off their computers.  (*Id.* at 41:22-25; 43:1-4.)

Indeed, Holmes admitted that she was *not* required to perform the majority of the log-off tasks that she claimed were mandatory in her Declaration. Specifically, she admitted that she was "not actually required to shut down" her computer at the end of her shift and that this "part of paragraph ten [of her Declaration] is incorrect."  (*Id.* at 72:8-18.)  Holmes also admitted that Kelly did *not* require her or other Agents to record time entries on a daily basis, but that it was her personal preference to do so.  (*Id.* at 72:24-25; 73:1-15.)  Holmes attributes a substantial portion of the time she claims it took her and other Agents to perform the log-off process to time

entry and powering down – two tasks that Holmes admits were not required.  (*Id.* at 74:7-20.)[5]

### C.     Holmes Admits Her Lack Of Knowledge About Other Agents

Holmes' testimony demonstrates that her knowledge regarding other Agents at the Health Net Facility – including Agents on her team – is nearly non-existent.  She has no knowledge regarding Agents who worked on other programs; Agents who worked on other Supervisor's teams; the day-to-day activities of other Agents that are central to the allegations in the Amended Complaint; the time other Agents (including Agents on her own team) spent logging-in and logging-off; and whether other Agents were compensated for all of their time worked.

Despite seeking conditional certification of a collective action of all of the Agents at the Health Net Facility, Holmes readily admits that she has no knowledge about Agents who work on any programs other than the VA Program she worked on.  (*Id.* at 41:2-4.)  Moreover, Holmes clarified in deposition that the knowledge she claims to have is limited to her specific team, consisting of approximately 6 employees. Specifically, Holmes admitted that her assertion regarding supposed directions to perform off-the-clock work is limited to Agents who *worked on her team*.  (*Id.* at 82:18-20.)  Holmes has no knowledge of communications to other potential members of the putative collective.  She testified that other than the email from Price, she has never seen any email from any supervisor to any other Agent concerning log-in and log-out practices.  (*Id.* at 88:14-17.)

Moreover, Holmes has no knowledge of the day-to-day activities of other Agents.  For example, Holmes testified that she does not know how long it took other Agents to perform log-in procedures, such as (1) organizing programs, (2) joining applicable chat rooms, or (3) reviewing emails for project updates and announcements.  (*Id.* at 66:9-17; 69:12-15.)  Further,

---

[5] Holmes estimated that the other task, shutting down programs, took only a few seconds.  (*Id.* at 73:25-74: 6.)

Holmes also admitted that, although she estimates that it took her 5 to 10 minutes per day to perform the log-in process and boot up her computer, she does not know how long it took any of the day-shift Agents or any night-shift Agents who worked downstairs.  (*Id.* at 70:16-71:5.)  Holmes also admitted that she does know in what order other Agents, *including Agents on her own team*, opened up programs.  (*Id.* at 71:8-18.)  To the extent Holmes even claims to have any personal knowledge regarding the log-off practices of other Agents, that potential knowledge is limited to Agents on her own team because Holmes admitted that she does not know what Agents on other teams did at the end of their shifts.  (*Id.* at 81:17-82:8.)

Finally, Holmes testified that she has never seen any other Agent's pay stubs, any other Agent's time sheets, any other Agent's MyPeopleNet entries, or InContact reports regarding any other Agent.  (*Id.* at 74:24-75:10.)  Thus, by her own admission, Holmes has no knowledge of whether other Agents were not compensated for all of the time that they worked.

## ARGUMENT

Section 216(b) of the FLSA enables an employee to bring a lawsuit against an employer for violations of the FLSA on behalf of herself and any other "similarly situated" individuals.  29 U.S.C. § 216(b).  Granting conditional certification can result in "considerable cost to the parties and a court" including, "at a minimum, the expense of sending out notice to the putative collective members, the substantial widening of discovery, and the burden on the courts of administering the [potentially] thousands of claims brought by opt-ins nationwide."  *Saleen v. Waste Management, Inc.*, No. 08-CV-4959, 2009 WL 1664451, at *8-9 (D. Minn. June 15, 2009).

Plaintiff's recitation of the so-called "lenient standard," *see* Pl.'s Mem. at 12, gives the erroneous impression that – based on the current posture of the case – there is a presumption in favor of conditional certification.  This is not so.  Courts recognize that "[a]lthough the standard for granting conditional certification is lenient, it is not non-existent."  *Cason*, 2011 WL 1659381

7

at *3; *see also Shipes v. Amurcon Corp.*, No. 10-14943, 2012 WL 995362, at *10 (E.D. Mich. Mar. 23, 2013) ("while Plaintiff's burden at this stage is not stringent, certification is by no means automatic") (citation omitted).  In fact, many courts in the Sixth Circuit applying the lenient standard have denied conditional certification.  *See, e.g.*, *Cason*, 2011 WL 1659381 at *3; *Langlands*, 2016 WL 4073548 at *4; *Perry v. Randstad General Partner (US) LLC*, No. 14-11240, 2015 WL 2237829, at *6 (E.D. Mich. May 12, 2015) (denying conditional certification "under the relatively lenient standard" where Plaintiffs had "not alleged facts suggesting that there are any other employees similarly situated . . . or that [the Defendant] has a policy or practice of denying non-exempt employees overtime"); *Arrington v. Michigan Bell Tel. Co.*, No. 10-10975, 2011 WL 3319691, at *4, 6 (E.D. Mich. Aug. 1, 2011) ("conclusory allegations are insufficient to support conditional certification") (citation omitted).[6]

In deciding the Renewed Motion, the Court must: (1) determine if Holmes has met her burden of showing that conditional certification is appropriate, and (2) satisfy itself that the litigation is manageable as a collective action.  *See, e.g.*, *Frye v. Baptist Mem'l Hosp., Inc.*, No. 07-2708, 2008 WL 6653632, at *4 (W.D. Tenn. Sept. 16, 2008)[7]; *Gromek v. Big Lots, Inc.*, No. 10-CV-4070, 2010 WL 5313792, at *3 (N.D. Ill. Dec. 17, 2010).  To meet this burden, Holmes must "submit evidence establishing at least a colorable basis for [her] claim that a class of

---

[6] *See also, e.g.*, *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 966 (W.D. Mich. 2009); *Gaffers v. Sitel Worldwide Corp.*, No. 3-16-0128, 2016 WL 3137726, at *3-4 (M.D. Tenn. June 6, 2016); *Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 872 (S.D. Ohio 2005).

[7] "[T]he first question a court should consider when deciding whether to conditionally certify a class and issue court supervised notice is whether 'there are other employees . . . who desire to opt-in.'" *Frye*, 2008 WL 6653632, at *6. (citation omitted). Holmes offers no evidence that other Agents are interested in opting-in. She offers no additional declarations (not even from Wright, Burrell, or Curtis, the three employees she identifies) and, while this case has been pending for over seven months, there has been only one opt-in, Tyishunda Beall, who is not a member of the re-defined proposed collective. (ECF No. 25-1; Walker Decl. ¶ 15.)

8

'similarly situated' plaintiffs exists." *O'Neal v. Emery Federal Credit Union*, No. 1:13–CV–22, 2013 WL 4013167, at *5 (S.D. Ohio Aug. 6, 2013) (internal quotation marks and citations omitted). Holmes cannot meet her burden based solely on her own conclusory assertions – "conditional certification should not be granted unless the plaintiff presents some evidence to support her allegations that others are similarly situated." *Harrison*, 411 F. Supp. 2d at 868 (citation omitted); *see also Arrington*, 2011 WL 3319691 at *4 ("conclusory allegations are insufficient to support conditional certification") (citation omitted); *Shipes*, 2012 WL 995362 at *4 (a plaintiff must prove that there is a reasonable basis to claim that there are other similarly-situated employees, and a plaintiff cannot satisfy his or her burden with "unsupported assertions") (internal quotation marks and citations omitted). Perhaps most importantly, Holmes' evidence in support must be admissible. *See Harrison*, 411 F. Supp. 2d at 865 ("only admissible evidence may be considered in connection with a § 216(b) motion") (citations omitted). Holmes cannot rely on mere speculation and hearsay.

Ultimately, Holmes' motion fails the test established by this case law, and should be denied for numerous reasons. *First*, the Court should disregard Holmes' Declaration because it is plagued with speculative and conclusory allegations about the practices of hundreds of Agents outside her own team, the program she worked on, Holmes' night-shift, and finally, her floor. These hollow assertions lack any predicate factual foundation, because Holmes' deposition testimony exposes that she has virtually no personal knowledge of the practices of other supervisors and Agents. Her assertions are based in inadmissible hearsay, and the knowledge she claims to have is necessarily temporally limited to a small portion of the putative collective action period. At bottom, Holmes' Declaration falls far short of demonstrating that she has personal knowledge of the other members of the putative collective suffering from the alleged

FLSA violation.  *Second*, Holmes' Motion should be denied because Price's email does not demonstrate a facility-wide policy.  *Third*, Holmes' Motion should be denied because she has failed to establish that there was a "policy-to-violate" Kelly's lawful time entry policy, which Holmes herself admits she did not follow.  *Finally*, Holmes' Motion should be denied because the proposed collective action is unmanageable.

### A.    Holmes′ Declaration Lacks A Sufficient Basis

Holmes seeks to certify a collective action of over 550 Kelly employees who worked over a multi-year period for at least 10 different supervisors.  However, before a plaintiff may send notice to potential opt-in plaintiffs, she must present "at least a colorable basis for [her] claim that a class of 'similarly situated' plaintiffs exists."  *O'Neal*, 2013 WL 4013167 at *5 (citations omitted).  Holmes' core allegation is that Kelly "regularly failed and refused to pay [her] and other Agents for work done prior to and after our scheduled shifts."  (ECF No. 5-2 ¶ 2; ECF No. 40-3 ¶ 12.)  Holmes cannot satisfy that burden with unsupported allegations of a policy or practice of violating the FLSA.  *O'Neal*, 2013 WL 4013167 at *8 ("[A] plaintiff must demonstrate a factual nexus – that is, something more than mere allegations – to warrant conditional certification and the delivery of notice to potential class members.").

Importantly, the "affidavits submitted at the notice stage must be based on [ ] personal knowledge . . . otherwise, [they] would not be any more probative than the bare allegations in the complaint, and the requirement of factual support would be superfluous."  *White v. MPW Indus. Servs.*, 236 F.R.D. 363, 369 (E.D. Tenn. 2006); *Shipes*, 2012 WL 995362 at *11 (E.D. Mich. Mar. 23, 2012) (denying conditional certification where "[h]er bare-bones affidavit states only, 'I know of other individuals who regularly worked overtime hours for Amurcon. . . . ' She does not even say whether these other, unspecified individuals were paid for their hours of overtime.")

Here, Holmes fails to satisfy her burden because the assertions in her Declaration lack foundation. Holmes fails to demonstrate personal knowledge of the widespread violations she alleges.  While she purports to have knowledge of such violations in her Declaration, Holmes made devastating admissions during her deposition that undermine, contradict, and expose the foundational problems in virtually every material aspect of her Declaration.

The evidence that Holmes puts forward contains foundational problems and cannot establish that she has personal knowledge of her alleged FLSA violations.  Specifically, Holmes' entire basis for claiming in her Declaration that all Kelly Agents at the Health Net Facility – and, prior to that, all of Kelly's brick-and-mortar call center agents nationwide – were not paid for pre-shift and post-shift time consists of (1) a single e-mail from Holmes' former supervisor to six individuals; and (2) inadmissible hearsay from three individuals, who Holmes claims told her that they "follow[ed] the same log-in and log-off procedures as me."  (ECF No. 40-3 ¶ 22; ECF No. 40-6.)  This evidence is simply insufficient to plausibly provide Holmes with personal knowledge of the widespread violations she alleges.

1.    **Holmes' Assertions Are Not Based On Personal Knowledge**

To meet her burden that a group of similarly situated individuals exists such that this case can be conditionally certified as a § 216(b) collective action, Holmes must point to admissible evidence.  Holmes' Declaration cannot do so because, while it pays lip service to the experiences of hundreds of putative collective action members, it is contradicted by Holmes' sworn testimony.  Taken together, Holmes details an admitted lack of personal knowledge regarding, *inter alia*: (1) any instructions received by other Agents; (2) the amount and type (if any) of pre-shift and post-shift work performed by other Agents; and (3) whether other Agents were compensated for all time worked.

11

Holmes' broad sweeping allegations in her Declaration crumble under scrutiny. Numerous damaging admissions in her deposition expose her limited personal knowledge of the practices and experiences of other Agents and supervisors other than her own.  For instance, Holmes states her in Declaration that:

> Defendants also knew that I and other hourly Agents regularly worked off-the-clock because supervisors specifically directed us to perform the off-the-clock work and told us that we would not start getting paid at the start of our scheduled shift.

(Holmes Decl. ¶ 17.)  This assertion is central to Holmes' bid for conditional certification. However, Holmes clarified at her deposition that the "hourly Agents" she referred to in this Paragraph *refers only to Agents on her team*. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 82:18-20.)  Holmes' assertion does not concern the Health Net Facility generally, or any other shift, or the "downstairs" Agents on the night shift, or even the other "upstairs" night shift team. This assertion says nothing about Agents other than, at best, the Agents on her team under Price.

Holmes' allegation in Paragraph 24 of her Declaration is likewise not based on personal knowledge, and again, at best, pertains to only a tiny subset of the putative collective.  Holmes asserted her "understanding that supervisors throughout the Hampton, Virginia [call center] often sent similar e-mails to their teams with similar directives and instructions regarding log-in and log-out practices and procedures."  (Holmes Decl. ¶ 24.)  Holmes admitted and clarified that her "understanding," referred to in this Paragraph, is based solely on conversations with two members of her own team – who were subject to the same supervisory authority – and a single member from another team on the nightshift.  (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 89:22-90:2.)  Indeed, Holmes has no knowledge of "similar e-mails" from other supervisors. She admitted that she has not seen any email from any other supervisors to any other Agents about log-in and log-off practices.  (*Id*. at 88:14-17.)  Thus, her assertion is rooted entirely in

12

inadmissible hearsay.  Moreover, even if it were admissible, Holmes admitted that by
"supervisors," this assertion refers only to *night-shift* supervisors, not all supervisors at the
Health Net Facility.  (*Id*. at. 86:20-87:9.)  As Holmes made clear at deposition, her Declaration
says *nothing* about the vast majority of the putative collective, or their communications with
their supervisors.

Holmes similarly clarified, contradicted and limited virtually every material assertion in
her Declaration. For example, in Paragraphs 8 and 14 of her Declaration, Holmes lists a series of
pre-shift tasks that she claims her and "other Agents" were required to perform.  (Holmes Decl.
¶¶ 8, 14.)  Specifically, Holmes lists: (1) "[s]tarting my computer"; (2) "[o]pening, logging into,
and connecting to various computer programs, software programs, applications and servers,
including but not limited to: Lotus, QC, DOMA, InContact"; (3) "[r]eviewing emails for project
updates and announcements"; (4) "[j]oining any applicable chat rooms"; and (5) "[o]rganizing
programs in a management way to improve efficiency throughout my shift."  (*Id.* ¶ 8.)  However,
Holmes admitted that Agents were instructed not to power off their computers, and thus the need
to power on her computer Holmes asserted "prior to each shift" actually occurred "*maybe* once a
week." (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 41:22-43:4 (emphasis added).)  Holmes
testified that she sometimes reviewed her emails after her shift started.  (*Id.* at 64:6-10.)  With
respect to the remaining log-on tasks that she claims she and "other Agents" were supposedly
required to perform pre-shift, Holmes admitted that she does not know how long it took other
Agents to (1) organize their programs, (2) join applicable chat rooms, or (3) review emails for
project updates and announcements.  (*Id.* at 66:9-17; 69:12-15.)  And, although Holmes
estimates in her Declaration that it took her "5 to 10 minutes per day" to perform the log-in
process and boot up her computer, and states that "Defendants failed to pay me and other Agents

for no less than 7 to 13 minutes per day, Holmes Decl. ¶¶ 9, 13, she admitted during her deposition that she does not know how long these activities took day-shift Agents, or even the night-shift Agents who worked downstairs.  (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 70:16-25; 71:1-5.)  Holmes even admitted that she does not know what order other Agents, including Agents on her own team, opened up programs, *see id.* at 70:5-71:18, and thus has no possible knowledge of whether they did so "off the clock."  Moreover, she admitted that she has never seen any other Agent's pay stubs, time sheets, or MyPeopleNet entries, or any InContact reports regarding another Agent.  (*Id.* at 74:24-75:10.)  Thus, Holmes has no basis to assert (and the Court has no basis to infer) that any other Agents performed any such task "off the clock" or that any other Agents were not compensated for any such work.

Holmes' deposition testimony similarly contradicts the assertions in her Declaration concerning the "required" log-off process.  Holmes claims that she and other Agents were required to perform three categories of off-the-clock tasks "after each shift", including: (1) "[m]anually recording time entries in MyPeopleNet and cross checking for errors"; (2) "[q]uitting, disconnecting, shutting down and logging out of various computer programs"; and (3) "[s]hutting down my computer."  (Holmes Decl. ¶ 10.)  However, Holmes testified that she was "not actually required to shut down" her computer at the end of her shift, and that this "part of [her Declaration] is incorrect." (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 72:8-18.)  She also testified she and other Agents were not required to manually record time entries on a daily basis, but that it was her personal preference to do so.  (*Id.* at 72:24-25; 73:1-15.)  Holmes similarly admitted that only "some" Agents recorded their time daily.  (*Id.* at 73:16-18.) Notably, Holmes offers no facts regarding which other Agents might have done so.

Holmes testified that the remaining alleged log-off task – shutting down various computer programs – took "seconds" to perform. Thus, of the 2 to 3 minutes that Holmes claims it took to complete the log-off tasks described in her Declaration, the only required task took seconds to perform.  The other tasks were not required.  (*Id.* at 74:7-20.)  Moreover, again, according to her own testimony Holmes' supposed knowledge is limited to the log-off practices of *Agents on her own team*. (*See id*. at 81:21-82:3.)

Additionally, Holmes makes two other assertions in her Declaration that she admits lack foundation. Holmes states that "Defendants . . . regularly failed and refused to pay me *and other Agents* for work done prior to and after our scheduled shifts," and that "Defendants failed to pay me *and other agents* for no less than 7 to 13 minutes per day of work performed in connection with these pre- and post-shift activities.  (Holmes Decl. ¶¶ 12, 13 (emphases added).)  While Holmes' Declaration purports to demonstrate first-hand knowledge of other Agents' uncompensated work, her deposition testimony demonstrates that she has no such personal knowledge.  Specifically, Holmes testified that: (1) she has never seen any other Agent's pay stubs; (2) she has never seen any other Agent's time sheets; (3) she has never seen any other Agent's MyPeopleNet time entries; (4) she has never seen any reports from InContact – the system that tracks when employees logged in and out – concerning any other Agents. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 74:24-75:10.)  Thus, in addition to being unaware how long the log-on and/or log-off processes took other Agents, Holmes does not even claim to have personal knowledge of whether other Agents were compensated for those tasks.

As discussed above, Holmes' Declaration is plagued with conclusory assertions insufficient to support conditional certification. As this Court has held, parroting the factual conclusions Holmes seeks cannot support collective action certification.  *See Arrington*, 2011

15

WL 3319691 at *6 (denying conditional certification in part because "they provide nothing more than conclusory allegations"); *Goldfaden v. Wyeth Labs., Inc.*, No. 08-10944, 2010 WL 2011310, at *8 (E.D. Mich. May 19, 2010), *aff'd*, 482 F. App'x 44 (6th Cir. 2012) ("[T]o the extent Plaintiff's affidavit includes information based on her beliefs . . . she lacks foundation and personal knowledge on those matters, and it should be excluded."). Holmes' lack of personal knowledge is even more problematic in light of the fact that she has failed to submit any evidence other than her own limited Declaration. For example, in denying conditional certification, the court in *Langlands* explained:

> Plaintiffs seek to conditionally certify a broad class encompassing employees from multiple restaurants for current and former tipped employees. But they do not provide declarations from anyone who worked as a hostess (Defendant says hostesses receive some tips), nor do they provide declarations from other locations.

*Langlands*, 2016 WL 4073548 at *3. Holmes' Declaration is not supported by personal knowledge, and is replete with guesswork as to the experiences of unidentified, nameless employees across various programs, teams, and shifts. Just as in *Langlands*, Holmes' limited assertions and even more limited knowledge cannot support conditional certification of a putative collective encompassing the entire Health Net Facility.

## 2.   Holmes' Assertions Are Based On Inadmissible Hearsay

Holmes' assertions regarding what Wright, Burrell and Curtis purportedly told her fare no better in meeting Holmes' burden. Holmes' primary evidence of an alleged unlawful common policy consists of the assertions in Paragraphs 22 and 24 of her Declaration. In Paragraph 22, Holmes states that she was "personally informed by fellow agents" Wright, Burrell, and Curtis "that Defendants required them to follow the same log-in and log-off procedures . . . ." (Holmes Decl. ¶ 22.) Likewise, in Paragraph 24, Holmes asserts that it was her "understanding that supervisors throughout the Hampton Virginia [call center] often sent

similar e-mails to their teams with similar directives and instructions regarding log-in and log-out practices and procedures." (*Id.* ¶ 24.)  During her deposition, however, Holmes clarified that her "understanding" referred to in Paragraph 24 was based solely on conversations with Wright, Burrell and Curtis.  (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 86:20-87:14; 88:18-22.) Holmes' assertions in Paragraphs 22 and 24, thus contain, and are grounded in, inadmissible hearsay, which cannot be considered in deciding conditional certification.  *See Harrison*, 411 F. Supp. 2d at 865-66 ("Courts . . . have repeatedly held that only admissible evidence may be considered in connection with a § 216(b) motion") (citations omitted).

The hearsay statements are also entirely unreliable for a number of additional reasons. Holmes' Declaration never explains what the substance of the communications entailed, or whether Holmes reviewed any facts or information to determine whether any other putative collective member was directed to, and did in fact, perform the same log-in and log-off procedures.  Likewise, the statements in the Declaration are devoid of any basis for how or why Holmes would know if any other Agent was deprived of compensation to which he or she was entitled.  As Holmes' deposition testimony makes clear, she could not plausibly have personal knowledge of these crucial underlying facts.

For instance, during her deposition, Holmes admitted that, other than Price's email to her team (which includes Wright and Burrell), Holmes was not privy to emails from *any* other supervisor to *any* other Agent with instructions concerning log-in and log-out practices. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 88:14-17.)  Similarly, Holmes testified that she has never seen any other Agent's pay stubs, time entries, MyPeopleNet entries, or InContact reports.  (*Id.* at 74:24-75:6.)  Thus, the assertions in Paragraphs 22 and 24 of Holmes' Declaration exhibit the classic reliability problems that render hearsay evidence untrustworthy

17

and inadmissible.  The Court should not certify a collective of hundreds of employees on the strength of hearsay statements whose veracity Holmes cannot verify.

Even if the statements *were* admissible and could be considered, they provide no evidence of a common policy or that any of the hundreds of Agents who worked for at least 10 different supervisors are similarly situated to Holmes.  First, Holmes admitted that the "supervisors" mentioned in Paragraph 24 of her Declaration refer *only* to night-shift supervisors. (*Id.* at 86:5-9.)  Thus, by her own admission, Holmes has no personal knowledge regarding the practices or communications of any day-shift supervisors or the Agents who worked under them. Holmes similarly admitted that she saw no other emails from any supervisor other than Price, and that no employees other than Wright, Burrell and Curtis ever told her about receiving emails with directions concerning log-in and log-out procedures.  (*Id.* at 88:14-22.)  Importantly, Wright, Burrell and Curtis all worked on the night shift with Holmes, and Wright and Burrell worked on the *same* team as Holmes.  (*Id.* at 89:22-90:6.)  Far from establishing a common policy or similar log-in and log-out practices amongst all potential members of putative collective, and putting aside its hearsay problems, Holmes' Declaration at best demonstrates similar instructions sent to two people from her team and (potentially) one other person.

Nonetheless, Holmes asks the Court to overlook these hearsay, reliability, and foundation problems, and extrapolate the anecdotal experience of (at best) a few employees on the same team and the same shift to the entire 550 potential members of the putative collective action. Holmes' Declaration falls far short of setting forth sufficient personal knowledge to support such an incredible inference.  *See, e.g.*, *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 440 (S.D. Ind. 2012) (finding that the mere fact that "some supervisors . . . instructed CSRs . . . to log in to their computers and pull up their systems before logging in" was not evidence of a company-wide

policy.)  Importantly, Holmes has not demonstrated whether any of these individuals followed these instructions, or in the case of Curtis, what the instructions even stated.  Thus, even if Holmes has personal knowledge that *some* other Agents *on her team* performed similar pre- or post-shift tasks, she has not demonstrated that she has personal knowledge that these Agents were not compensated for this work. *See Combs v. Twins Grp., Inc.*, No. 3:16-CV-295, 2016 WL 7230854, at *2 (S.D. Ohio Dec. 14, 2016) ("It may be reasonable to infer that Combs observed other crew members working overtime hours . . . but there is no basis to infer how he also came to know that they were not paid for their overtime hours.")

### 3. Holmes Only Worked During A Small Portion Of The Collective Action Period

Holmes was employed at the Health Net Facility from August 10, 2015 through March 31, 2016.  (Walker Decl. ¶ 8.) Similarly, Price, Holmes' supervisor who allegedly instructed her team to perform off-the clock work, did not begin working at the Health Net Facility until August 17, 2015.  (*Id*. ¶ 9.)  Holmes has not demonstrated that she has personal knowledge of the instructions provided to, or log-in and log-out practices of Agents who worked at the Health Net Facility prior to her employment, or after her termination. Nonetheless, Holmes seeks to conditionally certify a collective of Agents who worked at the Health Net Facility "at any time in the past three years." (Pl.'s Mem. at 1.)  Holmes offers no evidence regarding the time before or after her employment.  Without more, Holmes' proposed collective is impermissibly overbroad.

### B. Price's Email Does Not Demonstrate A Facility-Wide Policy

The e-mail Holmes relies upon was sent by one supervisor to only six of the more than 550 individuals who have worked for Kelly at the Health Net Facility.  (ECF No. 40-6.)  It was sent on March 22, 2016 – nine days before Holmes' employment with Kelly ended.  (*Id*.; Walker

19

Decl. ¶ 8.)  The e-mail is not even evidence of a policy that extends to all "upstairs" Agents, let alone the entire night shift, or all of the Agents at the Health Net Facility.

Reading the e-mail as Holmes does, it undoubtedly conflicts with Kelly's written policies at the Health Net Facility, which required Agents to "[r]ecord in your timekeeping system the exact time you sat down at your workstation to log in for the day" and to "[r]ecord in your timekeeping system the exact time you complete all tasks for the day."  (ECF No. 40-5 at 2.) And to the extent Holmes interpreted the e-mail as requiring uncompensated, pre-shift or post-shift work, Holmes admits that she was required to report the e-mail to Kelly's Employee Service Center:  "If for any reason you are instructed not to record all hours worked or are instructed to record only your *scheduled* start and end times instead of your *actual* start and end times you must immediately notify the Employee Service Center . . . ."  (ECF No. 40-5 at 3.) Holmes admits she failed to do so. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 83:21-24.)

At most, Price's e-mail shows that nine days before Holmes was terminated, a tiny subset of the putative collective was told they could work off-the-clock.  This is not nearly enough to support the conclusion that all Agents at the Health Net Facility even received similar communications, much less that all Agents performed uncompensated work, or were required to do so.  Confronted with similar circumstances, the court in *Hawkins* found that a document sent to a few employees was insufficient to support conditional certification.  287 F.R.D. 431 (S.D. Ind. 2012).  In *Hawkins*, the plaintiff, a call center worker, brought a putative collective action against her employer in which she claimed she and the members of the putative collective were not paid for pre-shift and post-shift work.  *Id.* at 439.  In support of conditional certification, the plaintiff offered a document sent to a group of putative collective action members stating that call center workers should be at their desk 10 minutes prior to their shift start time.  *Id.* at 436.

The court found that this was insufficient, as there was no evidence that "the document was distributed to all CSRs, or even more than a few." *Id*. at 440.  This Court should hold the same.

### C.      Holmes Has Not Demonstrated A "Policy-To-Violate" Kelly's Lawful Policy

There is no question – and indeed Holmes testified – that Kelly has a written policy expressly forbidding the practices Holmes alleges occurred at the Health Net Facility.  Thus, Holmes bears the burden of demonstrating that there was a policy to violate Kelly's lawful policies that applied to all putative collective members.  *See Pacheco*, 671 F. Supp. 2d at 962 ("[T]he Court must review the evidence to determine whether there is a factual basis for Plaintiffs' claim that Defendant's common or uniform practice was to not follow its formal, written policy.")  Holmes cannot meet this burden.

The court in *Pacheco* denied plaintiffs' motion for conditional certification because (1) the defendant had an express written policy requiring employees to perform preliminary and postliminary work "on the clock," (2) plaintiffs failed to present sufficient evidence to support their assertion they were required to perform such work "off-the-clock," and (3) although plaintiffs alleged a "disconnect between the written policy and what happens in practice," they did not present evidence sufficient to establish the "disconnect" was a common policy or practice which applied to all members of the putative collective.  *Pacheco*, 671 F. Supp. 2d at 962.  The court in *Pacheco* found that the supporting affidavits contained "identical generic language" that the affiants supposedly "know of many others . . . who were also required to [perform "off-the-clock" preliminary and postliminary work] and who were also not properly compensated for all the hours they worked."  *Id*. at 963.  In the absence of evidence about how, or whether, others were given similar instructions to work without pay, the court in *Pacheco* concluded the plaintiffs failed to demonstrated that they were "similarly situated" with others "because there

[was] a formal policy to pay employees for donning and doffing activities, any failures to follow that policy will be unique to specific departments and supervisors." *Id*. at 966.

Similarly, in *Saleen*, the plaintiffs sought conditional certification of a company-wide collective action claiming the employer had an unwritten "policy-to-violate" its lawful policies. *Saleen*, 2009 WL 1664451 at *4-5. The plaintiffs alleged the employer forced employees to work off the clock during their unpaid lunch breaks. *Id*. As in this case, the defendant-employer in *Saleen* had a formal policy to record, and pay employees, for all time worked. *Id*. The court in *Saleen* found no "policy-to-violate" the employer's lawful policies because (1) only a tiny fraction of putative plaintiffs alleged they were not paid for time they claimed they worked, and (2) the plaintiffs failed to provide direct evidence of an unlawful policy that applied to all putative plaintiffs. *Id*. The court in *Saleen* would not "infer that [defendant] had a common, nationwide, unlawful policy not to compensate for untaken meal breaks." *Id*.

The analysis in *Saleen* and *Pacheco* applies with equal force here. Kelly's written policy was wholly lawful. Kelly required that employees at the Health Net Facility, record all their time worked in a time-entry system called MyPeopleNet. (Walker Decl. ¶ 16; ECF No. 40-5 at 2.) Kelly's policy required Kelly's Agents at the Health Net Facility to "[r]ecord in your timekeeping system the exact time you sat down at your workstation to log in for the day" and to "[r]ecord in your timekeeping system the exact time you complete all tasks for the day." (ECF No. 40-5 at 2.) The policy also required Kelly's Agents to "[r]eview your time and pay records to ensure that your time was recorded accurately." (ECF No. 40-5 at 3.)[8] Finally, the policy required that "[i]f for any reason you are instructed not to record all hours worked or are

---

[8] Kelly's Employee Handbook, which Holmes acknowledged receiving on August 6, 2015, *see* Walker Decl. ¶ 20, Ex. B, provided that employees were required to "[r]ecord and report all actual hours worked – no more and no less – for each day worked." (*Id.* ¶ 21, Ex. C at 3.)

instructed to record only your *scheduled* start and end times instead of your *actual* start and end times you *must immediately notify* [Kelly]."  (ECF No. 40-5 at 3 (emphasis added); Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 83:25; 84:1-3.)  Holmes admits that she not only violated this policy and did not report all of her time worked, but that she never discussed the supposed "instruction to perform off-the-clock work" with anyone, including Price.  (*Id*. at 83:17-84:14).  Holmes also admitted that neither Kelly nor Health Net ever instructed her to stop reporting her time worked. (*Id*. at 78:9-11.)

Holmes offers no evidence to suggest there was a "policy-to-violate" Kelly's lawful timekeeping policies even throughout the upstairs portion of the night shift, much less other shifts or the entire Health Net Facility.  Indeed, her allegations of a "policy-to-violate" Kelly's policy are based entirely on her own personal experience, unique to her team, under her supervisor, Price.  *See Jones v. Xerox Commercial Solutions, LLC.*, No. 4:13-CV-650, 2013 WL 5945652, at *3 (S.D. Tex. Nov. 6, 2013) ("Certification should be denied if the action arises from circumstances purely personal to the plaintiff . . . .").

Price's email to a handful of Agents merely demonstrates one supervisor's policy, applicable (if at all), only to that team. Allegations of individual or localized violations by supervisors do not suggest a company-wide policy or practice.  *See Hawkins*, 287 F.R.D. at 440 (document insufficient to support conditional certification where there was no evidence that "the document was distributed to distributed to all CSRs, or even more than a few"); *Pacheco*, 671 F. Supp. 2d at 966 (concluding the plaintiffs failed to adduce sufficient evidence they were "similarly situated" with others "because there [was] a formal policy to pay employees for donning and doffing activities, any failures to follow that policy will be unique to specific

departments and supervisors").[9]  Price's team is a tiny fraction of the putative collective, and the email is therefore insufficient to support conditional certification.

### D.      The Proposed Collective Is Unmanageable

Here, the "resolution of each [Agent's] claim will require individualized inquiries about his or her specific managers' policies and practices," as well as whether each Agent followed Kelly's policy by actually recording all the time worked, or instead followed a supervisor's contrary suggestion. *See Richardson*, 2012 WL 334038 at *4. The Court will also need to resolve which mandatory and/or optional log-in and log-off tasks each Agent performed, when they performed them, and how long they took. For example, Holmes admits that the time for computers to power up varied, and the time required for the various programs to launch varied. (Maatman Decl. ¶ 4, Ex. 2, Holmes Dep. Tr. at 61:13-62:10; 62:19-63:5.)

Holmes' experience is particularly individualized in light of her decision to disregard Kelly's time-entering policies, and not to address the issue with any management. Holmes admitted that, despite Kelly's policy that employees should record all time worked, she stopped entering the time she actually worked and instead entered the time she was scheduled to work. (*Id.* at 77:10-13.) Holmes offers no evidence regarding the time-entry practices of other Agents at the Health Net Facility, including whether they, too, decided to contravene Kelly's time-entry policies.  Conditional certification cannot be based on Holmes' naked assumption that other

---

[9] *See also, e.g.*, *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-CV-00738, 2012 WL 334038, at *4 (S.D. Tex. Feb. 2, 2012) ("The fact that three or four managers allegedly required or condoned off-the-clock work is insufficient . . . ."); *Chalker v. Burlington Coat Factory of Fla., LLC*, No. 8:12-CV-2755, 2013 WL 5954783, at *3 (M.D. Fla. Nov. 7, 2013) (denying certification where store managers acted independently and in defiance of stated policy); *Adair v. Wis. Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *7 (E.D. Wis. Sept. 11, 2008) ("Alleged FLSA violations . . . from . . . decisions of individual supervisors . . . are not appropriate for collective treatment."); *MacGregor v. Farmers Ins. Exch.*, No. 10-CV-3088, 2011 WL 2981466, at *3 (D.S.C. July 22, 2011) (same); *Moeck v. Gray Supply Corp.*, No. 03-1950, 2006 WL 42368, at *5 (D.N.J. Jan. 6, 2006) (denying certification where plaintiffs "failed to establish that other supervisors employed the same policies").

Agents (even Agents on her own team) similarly chose to violate that policy – particularly since Holmes' deposition exposes her lack of personal knowledge regarding other Agents.

In short, collective resolution of the claims at issue would require an unwieldy and unmanageable litigation, and would devolve into hundreds of individualized inquires and mini trials. *See, e.g.*, *Gromek*, 2010 WL 5313792 at *3 (denying first-stage conditional collective action certification based on manageability concerns even where plaintiffs showed they were similarly situated); *Richardson*, 2012 WL 334038 at *5.  Thus, the Court should deny conditional certification.

## **CONCLUSION**

Plaintiff presents little more than her own individual allegations.  Her unequivocal testimony demonstrates that she cannot establish a basis for conditionally certifying a putative collective action, much less one encompassing an employee population about which Holmes does not even claim to have knowledge.  For the foregoing reasons, Kelly respectfully requests that the Court deny Plaintiff Holmes' Renewed Motion for Conditional Certification.

DATED:  April 19, 2016

KELLY SERVICES USA, LLC and KELLY SERVICES, INC.

By:____*s/ Gerald L. Maatman, Jr.*_____
       Gerald L. Maatman, Jr.

Gerald L. Maatman, Jr., IL No. 6181016
(gmaatman@seyfarth.com)
Peter J. Wozniak, IL No. 6294133
(pwozniak@seyfarth.com)
SEYFARTH SHAW LLP
233 S Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
Phone:          (312) 460-5000
Facsimile:     (312) 460-7000

William B. Forrest III
(wforrest@kohp.com)
Kienbaum Opperwall Hardy & Pelton, P.L.C.
280 North Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
Phone:  248-645-0000
Fax:  248-723-1110


*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he served a copy of the foregoing on the following

through the Court's electronic case filing system on this 19th day of April, 2017:

> Jason J. Thompson
> Kevin J. Stoops
> Jesse L. Young
> Sommers Schwartz, P.C.
> One Towne Square
> Suite 1700
> Southfield, Michigan 48076
> 248-355-0300
> jthompson@sommerspc.com
> kstoops@sommerspc.com
> jyoung@sommerspc.com

> s/ Gerald L. Maatman, Jr.
> Gerald L. Maatman, Jr.