UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACIE HOLMES,

      Plaintiff,                           Case No. 16-cv-13164
                                                  Hon. Matthew F. Leitman

v.

KELLY SERVICES USA, LLC *et al*.

      Defendants.
_____/

## OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RENEWED MOTION FOR CONDITIONAL CERTIFICATION (ECF #40), (2) ALLOWING PLAINTIFF TO SEND OPT-IN NOTICES, AND (3) STAYING ACTION

Plaintiff Tracie Holmes worked as a call-center agent at a call center in Hampton, Virginia from August 2015 through March 2016. In this putative collective action, Holmes alleges that her employers at the call-center, Defendants Kelly Services USA, LLC, Kelly Services, Inc.,[1] and Health Net Federal Services LLC, violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"), when they failed to pay her and her fellow agents for all of the time they worked each day. Holmes now asks the Court to conditionally certify a collective of all hourly call-center agents who worked at the Hampton facility during the previous

_____

[1] For ease of reference, the Court will refer to both Kelly Services entities collectively as "Kelly Services."

1

three years.  For the reasons that follow, the Court will (1) conditionally certify an FLSA collective, but one not nearly as broad as Holmes has requested, (2) allow Holmes to send opt-in notices to that limited collective, and (3) stay this action pending future decisions by the United States Supreme Court and United States Court of Appeals for the Sixth Circuit in the cases identified below.

## I

### A

Kelly Services "manage[s] employment opportunities for more than one million workers around the globe." (First Am. Compl. at ¶2, ECF #34 at Pg. ID 825.) Among other things, Kelly Services "employs call center agents…in a number of different environments (*e.g.*, brick-and-mortar sites and on-site at their clients' locations)." (*Id.* at ¶3, Pg. ID 825.)  Health Net runs one such "brick-and-mortar call center" that Kelly Services uses in Hampton, Virginia. (*Id.* at ¶4, Pg. ID 826.)

Kelly Services operates two different call-center programs out of the Hampton facility: the "Veterans Affairs Choice" program (the "VA Program") and the Tri-Care program. (*See* Holmes Dep. at 28-29, ECF #62-1 at Pg. ID 1414.)  About 150 call-center agents work on the VA Program, and they are separated into a day shift and a night shift. (*See id.* at 30-32, Pg. ID 1415.)  The night shift consists of six different "teams" that work under different supervisors. (*Id.* at 33-35, Pg. ID 1415-16.)  Each night-shift team is comprised of approximately ten call-center agents. (*See*

2

*id.* at 30, Pg. ID 1414)  Two of these teams work on an upstairs floor of the Hampton facility, and four teams work on a downstairs floor. (*See id.*)  The remaining agents assigned to the VA Program are assigned to the day shift. (*See id.* at 30-31, Pg. ID 1414.)

**B**

Holmes began working for the Defendants at the Hampton facility in August 2015.[2] (*See id.* at 26, Pg. ID 1414.)  At that time, she participated in a two-week training and orientation program. (*See id.* at 43-44, 48, Pg. ID 1418-19.)  Holmes says that she participated in this program with approximately 15-20 other call-center agents and that all but one of those agents worked on the night shift. (*See id.* at 44-45, 60-61, Pg. ID 1418, 1422.)

During this two-week program, Kelly Services trained Holmes and the other agents on how to use the computer programs that they would need to use on a daily basis and provided instruction on its policies and procedures, including the company's time-keeping policy.  Among other things, the trainers told the agents that they needed to be ready to work immediately upon the start of their scheduled shift time. (*See id.* at 59, Pg. ID 1422.)  Because agents could not begin their work

---

[2]  In Holmes' First Amended Complaint, she alleges that she was "jointly employ[ed]" by Kelly Services and Health Net. (First Am. Compl. at ¶4, ECF #34 at Pg. ID 826.)  Health Net denies that it employed Holmes. (*See* Health Net Resp. Br. at n.1, ECF #60 at Pg. ID 1316-17.)  The Court need not resolve that dispute for the purposes of ruling on Holmes' conditional certification motion.

without first logging into various computer programs, Holmes says that the trainers told her and the other agents to arrive at work early so that they could "launch" the required programs before their shift officially started. (*Id.* at 59-60, Pg. ID 1422.) The trainers instructed Holmes and the other agents to record these pre-shift activities as "time worked" on their time sheets, and they said that Kelly Services would pay the agents for this additional working time. (*Id.* at 75, Pg. ID 1426.) The trainers further told the agents that if they recorded this time but were not paid for it, or were otherwise instructed "not to record all of [their] working time," to report that discrepancy to Kelly Services' "service center" so that it could be remedied. (*Id.* at 83-84, Pg. ID 1428.)

At or around the time of Holmes' training, she also received a copy of Kelly Services' time-keeping policy. (*See* ECF #40-5.) This policy provided that call-center agents would be paid for all of the time they spent working, including time spent "before, or after, [an agent's] shift doing required activities such as … turning on, or off, work stations, logging into, or out of, the company phone system, and initiating, or closing, software applications necessary to call-center duties." (*Id.* at Pg. ID 908.) The policy also specifically required agents to contact Kelly Services if their supervisors instructed them not to record all of the time they spent working:

> If for any reason you are instructed not to record all actual hours worked or are instructed to record only your *scheduled* start and end times instead of your *actual* start

and end times you must immediately notify the Employee
Service Center.

(*Id.* at Pg. ID 909; emphasis in original.)

## C

After Holmes completed the training and orientation program, she began
working on the VA Program. (*See* Holmes Dep. at 29-32, ECF #62-1 at Pg. ID 1414-
15.) Kelly Services assigned Holmes to a night-shift team under supervisor LaTanya
Price, located on the upstairs floor of the Hampton facility.[3] (*See id.* at 32, 34, Pg.
ID 1415-16.)

Holmes says that, consistent with her training, she would arrive at her work
station a few minutes before her scheduled shift time so that she could launch the
computer programs that she needed to conduct her work. (*See id.* at 64-66, Pg. ID
1423-24.) She would also spend a couple of minutes each day after her shift ended
logging out of her computer. (*See id.* at 73-74, Pg. ID 1425-26.) After her first week
of work, Holmes recorded all of this additional time (approximately 7-13 minutes
per day) on her time sheet. (*See id.* at 75-76, Pg. ID 1426.) However, when she
received her paycheck, she was not compensated for any of this pre- or post-shift
work. (*See id.* at 76, Pg. ID 1426.) Holmes believed that her supervisor, Price, had

---

[3] Homes would also fill in on a day shift "every once in a while" if she had other
plans at night. (Holmes Dep. at 31-32, ECF #62-1 at Pg. ID 1415.) However, she
primarily worked on the night shift. (*See id.*)

5

altered her time entries and deleted the time Holmes spent logging onto and off of her computer each day. (*See id.*)

Holmes never asked Price or anyone else why Price had seemingly altered the time entries. (*See id.* at 76-77, Pg. ID 1426.)  Nor did Holmes ever report the issue to Kelly Services' "service center" as required by Kelly Services' time-keeping policy. (*See id.* at 83-84, Pg. ID 1428.)  Instead, Holmes, on her own accord, "stop[ped] recording all of the time [she] actually worked and [] start[ed] recording [only] the time that [she was] scheduled [to work]." (*Id.* at 77-78, Pg. ID 1426-27.)

Approximately seven months later, on March 22, 2016, Price sent an email to Holmes and five other members of her team regarding when the agents should arrive at work. Holmes says that Price's email, quoted in full below, reinforced that agents were not to be paid for time spent working before and after their scheduled shifts:

> Please keep in mind that you are able to come on the production floor at 3:50pm, so that you can get logged onto the systems Lotus, QC, and DOMA.  However; [sic] if there is a problem that will give you time to contact the help desk or Leadership if needed.  You can log into In-Contact between 3:55 and 4:00pm.  *Please do not log into In-Contact at 3:50pm when you arrive, you will not start getting paid until 4:00pm.*  I know when 12:00am comes around most of you are ready to go, please do not log out of In-Contact until 12:30AM.

(ECF #40-6 at Pg. ID 911; emphasis added).  The following week, on March 31, 2016, Holmes left her job as a call-center agent at the Hampton facility.

6

## II

On September 1, 2016, five months after Holmes stopped working for the Defendants, she filed this action on behalf of all Kelly Services' call-center agents nationwide. (*See* Compl. ECF #1.)  In her Complaint, and in a declaration she signed under oath, Holmes claimed that Kelly Services "fail[ed] to pay [all of its call-center] [a]gents for [the] no less than 7 to 13 minutes per day" that the agents spent logging onto and off of their computers. (*See id.* at ¶¶ 28, 31, ECF #1 at Pg. ID 7-8; Holmes 9/14/16 Decl. at ¶¶ 7, 10, 13, ECF #5-2 at Pg. ID 69-70.)  Holmes insisted that she "kn[e]w that *all* of defendant's hourly agents [nationwide] are subjected to [these] same practices and procedures and that *all of us lost wages* because we were not paid properly." (Holmes 9/14/16 Decl. at ¶19, ECF #5-2 at Pg. ID 71; emphasis added.) Holmes thereafter filed a motion in which she asked the Court to conditionally certify a nationwide FLSA collective of "[a]ll current and former hourly call center agents [nationwide] who worked for Kelly Services USA, LLC or Kelly Services, Inc. at any time in the past three years." (ECF #5 at Pg. ID 28.)

At a subsequent hearing, the Court expressed concern about the foundation of some of the sworn statements in Holmes' declaration.  Specifically, the Court questioned how Holmes, who worked for eight months at one call center in Virginia, could have had personal knowledge (as she attested to in her sworn declaration) that *all* of Kelly Services' call-center employees nationwide were not properly paid for

7

all of the time they spent working. (*See*, *e.g.*, 11/29/16 Hearing Tr. at 41-42, ECF #45 at Pg. ID 1020-21.)  The Court provided Holmes the opportunity to address its concerns by submitting a supplemental declaration that set forth the basis of her personal knowledge. (*See* 11/29/16 Order, ECF #29 at Pg. ID 795.)

Instead of submitting a revised declaration, on December 16, 2016, Holmes filed a First Amended Complaint in which she seeks to represent a substantially narrower collective – one that includes only "current and former hourly brick-and-mortar call-center agents who worked for Defendants in Health Net Federal Services, LLC's Hampton, Virginia call center at any time during the last three years." (First Am. Compl., ECF #34 at ¶45, Pg. ID 835.)  Although much narrower than the nationwide collective that Holmes originally sought to represent, this collective still consists of hundreds of current and former call-center agents.

Holmes renewed her motion for conditional certification of the narrower collective on January 20, 2017. (*See* ECF #40.)  In support of that motion, Holmes submitted a revised declaration. (*See* ECF #40-3.)  In that revised declaration, Holmes appears to have reconsidered the extent of her knowledge.  While in her initial declaration she attested that all of Kelly Services' employees *nationwide* were not paid for "off-the-clock" work, in her revised declaration she says only that workers at the *Hampton facility* were not paid for that work.  According to Holmes, she "and other hourly Agents [at the Hampton facility] regularly worked off-the-

8

clock because supervisors specifically directed us to perform the off-clock work and told us that we would not start getting paid at the start of our scheduled shift." (*Id.* at ¶17, Pg. ID 901.)  Holmes insists that "*all* of Defendants' hourly [call-center agents] in the Hampton, Virginia call center are subjected to the same practices and procedures [as she was] and that *all of us lost wages* because we were not paid properly." (*Id.* at ¶20, Pg. ID 902; emphasis added.)

The Court held a telephonic status conference with counsel for all parties on February 23, 2017.  During that conference, the Court again expressed concern about whether Holmes had personal knowledge to support her broad statements about all call-center agents at the Hampton facility that she made in her revised declaration. The Court therefore allowed Defendants to take Holmes' deposition regarding those statements.

The Defendants took Holmes' deposition on April 6, 2017. (*See* Holmes Dep. Tr., ECF #62-1.)  The deposition revealed that Holmes had overstated her knowledge in her revised declaration in a number of respects.  Among other things, Holmes testified at her deposition that:

- She never worked on the Tri-Care Program and did not know anything about the agents who worked on the Tri-Care Program. (*See id.* at 29, 40-41, Pg. ID 1414, 1417.)
- She never saw any other employees' pay stubs or time sheets. (*See id.* at 74-75, Pg. ID 1426.)

9

- She was not aware how long it took day shift agents to log onto or off of their computers each day. (*See id.* at 70, Pg. ID 1425.)

- She did not know how long it took employees on any of the downstairs, night-shift teams to log onto or off their computers each day. (*See id.* at 70-71, Pg. ID 1425.)

- The second upstairs, night-shift team was "too far" away for her to know whether those employees logged out of their computers before or after the end of their scheduled shift. (*Id.* at 81-82, Pg. ID 1427-28.)

- Statements in her declaration that supervisors required their team members to work "off-the-clock" and not be paid for that additional time spent working referred only to other "night-shift" teams on the VA Program, not all call-center agents at the Hampton facility. (*Id.* at 86-87, 93, Pg. ID 1430.)

- She specifically recalled speaking with only three other employees at the Hampton facility about performing "off-the-clock" work without compensation: Jocelyn White, Elonda Burrell, and Ruth Curtis. (*See id.* at 88, Pg. ID 1429.)  Two of those three – Burrell and White – worked on the same team as Holmes. (*See id.* at 89, Pg. ID 1430.)

- Holmes did not recall speaking with any other call-center agents about not being paid for "off-the-clock" work. (*See id.* at 88, Pg. ID 1429.)

The Court held a hearing on Holmes' renewed conditional certification motion on June 28, 2017.  As of the date of this Opinion and Order, Holmes has not submitted any declarations and/or affidavits in support of her motion from any call-center agents other than herself.  In addition, no other employee at the Hampton

10

facility has filed an "opt-in" notice declaring that the employee is interested in joining Holmes' proposed collective.[4]

## III

Holmes asks the Court to conditionally certify a collective under 29 U.S.C. § 216(b). Collective actions "serve[] an important remedial purpose by allowing a plaintiff who has suffered only small monetary harm to join a larger pool of similarly situated plaintiffs in order to reduce individual litigation costs and employ judicial resources efficiently. *Gaffers v. Kelly Services, Inc.*, 203 F.Supp.3d 829, 842-43 (E.D. Mich. 2016) (internal punctuation omitted). "Section 216(b) establishes two requirements for a [collective] action: 1) the plaintiffs must actually be 'similarly situated,' and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).

Courts in this circuit have adopted a two-tiered approach when considering whether to certify a collective. "At the 'notice stage' – which takes place at the beginning of discovery – the court determines whether the suit should be conditionally certified as a collective action so that potential opt-ins can be notified

---

[4] On October 21, 2016, Tyishunda Beall filed an "opt-in" notice in which she sought to join this action as a plaintiff. (*See* ECF #25-1 at Pg. ID 767.) However, as Holmes' counsel has acknowledged, Ms. Beall did not work at the Hampton facility. She therefore falls outside of Holmes' proposed collective. As of the date of this Opinion and Order, no other person has filed an "opt-in" notice in this action.

of the suit's existence and of their right to participate." *Shipes v. Amurcon Corp.*, 2012 WL 995362, at *4 (E.D. Mich. Mar. 23, 2012).   To obtain conditional certification at this stage, a plaintiff need only make a "modest factual showing" that her position is "similar" to the putative members of the collective. *Comer*, 454 F.3d at 546-47.   This is a "fairly lenient standard" that "*typically* results in conditional certification of a representative class." *Id.* at 547 (internal quotation marks omitted; emphasis added).   However, it is not "a mere formality." *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 439 (S.D. Ind. 2012).   "*[S]ome* factual showing is required at this stage." *Combs v. The Twins Group, Inc.*, 2016 WL 7230854, at *3 (S.D. Ohio. Dec. 14, 2016; emphasis added).

"At the second stage, following discovery, trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer*, 454 F.3d at 547.   During this post-discovery phase, "the court has much more information on which to base its decision, and, as a result, it employs a stricter standard" *Id.* (internal punctuation omitted).

In this case, while the Court has allowed the Defendants to take limited discovery with respect to the facts Holmes' attested to in her revised declaration, the parties have not engaged in full discovery.   Accordingly, the Court will analyze Holmes' request for conditional certification under the pre-discovery, "fairly-lenient" standard.

**IV**

Holmes asks the Court to conditionally certify a collective of all hourly call-center agents who worked at the Hampton facility during the previous three years. But Holmes has failed to satisfy even her fairly-lenient burden to show that all of these other call-center agents are similarly-situated to her. The Court will therefore certify a much narrower collective – the only one that can be supported by the evidence Holmes has submitted.

**A**

As Holmes' counsel has acknowledged, for a call-center agent to be "similarly situated" to Holmes, that employee must have: (1) worked before and/or after his or her regularly scheduled shift time and (2) not been paid for that additional time spent working. Holmes has provided evidence that eight other call-center agents, all of whom worked under one of two night-shift supervisors, fall within this category. First, she has shown that five members of her team were copied on supervisor Price's March 22 email quoted above in which Price appeared to say that agents on her team would not be paid for pre-shift work. (*See* ECF #40-6 at Pg. ID 911.) Second, Holmes testified that two additional members of her team who were not copied on the March 22 email –Burrell and White – told her (Holmes) that they were not being paid for "off-the-clock" work. (*See* Holmes Dep. at 88-89, ECF #62-1 at Pg. ID 1429.) Finally, Holmes testified that Curtis, a downstairs night-shift agent who

worked under supervisor Tracy Wigfall, said that she received an email from Wigfall that was similar to the one Price had sent Holmes' team regarding "off-the-clock" work.[5] (*See id.*)

Under the fairly-lenient standard that applies here, this evidence could support a finding that the hourly call-center agents at the Hampton facility who worked under supervisors Price and Wigfall were required to work "off-the-clock" without compensation.[6]  These agents are therefore "similarly-situated" to Holmes, and the

---

[5] Holmes testified that she spoke with Curtis and that Curtis said that her supervisor, Wigfall, had sent Curtis an email "such as th[e] one" that Price sent to her team. (Holmes Dep. at 88-89, ECF #62-1 at Pg. ID 1429.)  Curtis did not specify whether the email was sent only to her or was sent to multiple members of her team.  Given the fairly-lenient standard that applies at this stage of the case, the Court will construe Curtis' statement as referring to an email that, like the email from Price, was sent to multiple members of her team.

[6] Defendants argue that the Court should not credit the statements allegedly made by Burrell, White, and Curtis because the statements are hearsay.  Courts in this circuit have reached different conclusions about whether hearsay statements may be considered when ruling on a motion for conditional certification. *Compare Harrison v. McDonalds Corp*., 411 F.Supp.2d 862, 866 (S.D. Ohio 2005) ("The Court finds that hearsay statements cannot be considered in connection with Plaintiff's § 216(b) motion for the purpose of determining whether other employees are similarly situated") *with Fisher v. Michigan Bell Telephone Company*, 665 F.Supp.2d 819, 825-26 (E.D. Mich. 2009) (rejecting argument that court should have disregarded plaintiffs' declarations in support of a Section 216(b) motion because they were based, in part, on inadmissible hearsay).  The Court here agrees with the court in *Fisher* that "[b]ecause final disposition is not an issue at the conditional certification stage, requiring a plaintiff to present evidence in favor of conditional certification that meets the hearsay standards of the Federal Rules of Evidence fails to take[] into account that the plaintiff has not yet been afforded an opportunity, through discovery, to test fully the factual basis of his case." *Fisher*, 665 F.Supp.2d at 826 (internal punctuation omitted).  Thus, at this early stage of the case only, where

Court will conditionally certify an FLSA collective comprised of hourly call-center agents who worked at the Hampton facility for these two supervisors.

## B

Holmes urges the Court to certify a much broader collective of *all* hourly call-center agents at the Hampton facility on that ground that she has presented evidence that the Defendants had a common policy or plan to deprive all agents of compensation for "off-the-clock" work. The Court disagrees and concludes that Holmes has not presented evidence of a common policy or plan that applies to all of the hourly agents at the Hampton facility.

First, Holmes cites Kelly Services' training practices as evidence of a common policy or plan to not pay agents for "off-the-clock" work. (*See* Holmes Reply Br., ECF #62 at Pg. ID 1387-88.) Holmes emphasizes that Kelly Services trained its employees to arrive at work before their start of their scheduled shifts in order to launch certain programs on their computers. (*See* Holmes Dep. at 59-60, ECF #62-1 at Pg. ID 1422.) But the fact that Kelly Services may have trained its call-center agents to arrive for work before their scheduled shift time (or to stay after their scheduled shift to log off of their computers) is not evidence that Defendants had a common policy *not to pay* the agents for this pre- and post-shift work. Holmes

---

Holmes' burden is fairly lenient, and full discovery has not yet started, the Court will consider the statements of Burrell, White, and Curtis when determining whether and to what extent to certify a collective.

has not presented any evidence that during the training, the agents were told (1) not to record their pre- and post-shift work on their time sheets or (2) that they would not be paid for that work.   In fact, during this same training, Kelly Services specifically told Holmes and the other agents to document all of the time they spent working – *including* the time spent before and after their scheduled shift times – and that Kelly Services would compensate the agents for that additional time. (*See id.*at 75, Pg. ID 1426; ECF #40-5 at Pg. ID 908.)   Kelly Services also trained its agents that if they were not paid for this additional working time, that they should report the discrepancy so that it could be addressed. (*See* Holmes Dep., ECF #62-1 at 83, Pg. ID 1428.)   The training that Holmes received therefore does not support her argument that Kelly Services had a common policy or plan *not to pay agents* for any "off-the-clock" time they spent working.

Second, Holmes argues that the Court may infer that Defendants had a common policy or plan not to pay its agents for all of the time they worked because she has "identifie[d] several specific co-workers" who were required to perform "off-the-clock" work without compensation. (Holmes Mot., ECF #40 at Pg. ID 873.) However, as noted above, all of these "specific co-workers" worked on one of only two teams at the Hampton facility.   And Holmes has failed to produce any evidence that any other agents on any other team were not paid for "off-the-clock" work. Indeed, Holmes has admitted that she does not have evidence that extends beyond

16

her team and Curtis' team. For instance, Holmes acknowledged that she did not know anything about the agents who worked on the "Tri-Care" Program at the Hampton facility and that she had very limited knowledge about the agents who worked on the day shift. (*See* Holmes Dep. at 29, 40-41, 70, and 86-87, ECF #62-1 at Pg. ID 1414, 1417, 1425, 1430.) Holmes further testified that while she observed some agents appear to arrive early or stay late, she never saw these employees' time sheets or pay stubs, could not tell how long it took them to log onto or off of their computers each day, and could not say whether they logged on and off during their shift or before and after their shifts ended. (*See id.* at 74-75, 81-82, Pg. ID 1426-28.) Holmes can therefore say nothing about whether most of the agents who worked at the Hampton facility were or were not compensated for "off-the-clock" work. She simply has failed to produce evidence that that any alleged non-payment for "off-the-clock" work extended beyond one or two "rogue" supervisors and the team members who reported to them. *Cf. Jackson v. Federal National Mortgage Association*, 181 F.Supp.3d 1044, 1057 (N.D. Ga. 2016) (granting motion for conditional certification in part because plaintiff submitted evidence that alleged instructions not to report overtime went beyond the "rogue actions of one or two individuals"). *See also Chalker v. Burlington Coat Factory of Florida, LLC*, 2013 WL 5954783, at *3 (M.D. Fla. Nov. 7, 2013) (denying motion for conditional certification in part because "plaintiff has presented no evidence of a 'common

17

scheme applied uniformly' …. To the contrary, plaintiff's evidence suggest[ed], at most, that one or more store managers, acting independently and not in accord with a common policy (and in defiance of a stated policy) coerced some employees into working overtime without compensation").

Courts have repeatedly refused to conditionally certify requested collectives where plaintiffs have likewise failed to present evidence about the other employees who would comprise the collective.  For example, in *Combs*, *supra*, a Taco Bell employee asked the federal district court to conditionally certify "a class of approximately twelve other Taco Bell employees" whom he alleged were "owed compensation for overtime hours worked during the same two-week period." *Combs*, 2016 WL 7230854, at *1.  In support of his certification motion, the plaintiff submitted a declaration in which he "[a]ssert[ed] … that he and the other Taco Bell crew members worked overtime hours for which they were not properly paid during the same two-week period." *Id.* at *2.  The court recognized that the plaintiff's burden at the conditional certification stage was "fairly lenient," and that the "rationale for applying a less rigorous evidentiary standard at this stage of the litigation [was] sound." *Id.* at ** 2-3.  Nonetheless, the court declined to certify the proposed collective in part because the plaintiff provided "no basis to infer how he [] came to know that [the other employees] were not paid" for the overtime they supposedly worked:

18

> Here, Combs has failed to present sufficient evidence to support a finding that he and the other crew members are similarly situated, even under a more lenient evidentiary standard. *Combs's declaration does not contain facts showing that he has actual or even constructive knowledge that his fellow crew members at Taco Bell worked overtime hours for which they were not paid.* Such a showing could be made at this early stage by, for example, demonstrating that Combs's knowledge is based on first-hand observations or conversations with co-workers. Without a proper foundation, Combs's declaration is merely a restatement of the Complaint's allegations. Permitting this case to proceed as a collective action on so little evidence would effectively eliminate the requirement that plaintiffs must make at least a modest factual showing that they are similarly situated to obtain conditional certification.

*Id.* (internal citation and quotation marks omitted; emphasis added). *See also Harrison v. McDonalds Corp.*, 411 F.Supp.2d 862, 871 (S.D. Ohio 2005) (denying motion for conditional certification and holding that plaintiff "failed to satisfy even her minimal burden of showing that other McDonald's employees are similarly situated" to her in part because "[p]laintiff has offered nothing but speculation to support her belief that other McDonald's employees were not paid all of the money to which they were entitled"); *Gaffers v. Sitel Worldwide Corp.*, 2016 WL 3137726, at *3 (M.D. Tenn. June 6, 2016) (holding that "[e]ven under the applicable 'lenient' standard for conditional certification, [p]laintiff must do more than simply state that [d]efendants fail[ed] to pay [agents] for the alleged time [spent logging onto and off of computers]," and denying conditional certification motion in part because the

plaintiff "has not shown that he has personal knowledge of the other [agents], how they record their time, why whether or in what manner they were required to work off-the-clock, or what specific policies or practices required other [agents] to not be paid for all work time").

Moreover, Holmes has not supported her "common policy or plan" argument with affidavits or declarations from other call-center agents who could corroborate her claim that the conduct of Holmes' supervisor was widespread. Although not essential to conditional certification, these declarations could have provided important support for her motion. *See*, *e.g.*, *Fisher v. Michigan Bell Telephone Company*, 665 F.Supp.2d 819, 826 (E.D. Mich. 2009) (granting motion for conditional certification and noting that "[p]laintiffs have submitted declarations of 67 opt-ins and have produced the deposition testimony of eight opt-ins supporting their claim that they are also victims of a common policy or plan that violates the FLSA"); *Gaffers*, 203 F.Supp.3d at 843 (granting motion for conditional certification in action where six employees submitted declarations).

Nor have any of Holmes' former co-workers "opted-in" to this action – including agents with whom Holmes' remains friendly and in contact. (*See* Holmes Dep. at 92-93, ECF #62-1 at Pg. ID 1430.)  This too is "a strike against certification." *Hadley*, 2012 WL 523752, at *5.

20

Simply put, Holmes has not produced any evidence that the vast majority of agents at the Hampton facility were required to work "off-the-clock" without compensation, and for that reason the Court declines to certify the broad collective she proposes. *See Arrington v. Michigan Telephone Co.*, 2011 WL 3319691, at *6 (E.D. Mich. Aug. 1, 2011) (denying conditional certification motion in part because "the plaintiffs have provided no evidence of common treatment beyond two experiences of [two named plaintiffs] and their [unsupported] beliefs that other [employees] are not being compensated for overtime work").

## V

In sum, Holmes has presented some evidence that agents at the Hampton facility who worked for supervisors Price and Wigfall worked "off-the-clock" *and* were not paid for that time.  That evidence satisfies her fairly-lenient burden of identifying similarly-situated employees who could comprise an FLSA collective. Accordingly, the Court will conditionally certify a collective under the FLSA of all hourly call-center agents who worked at the Hampton facility for the past three years that worked for either (1) supervisor Price's team or (2) supervisor Wigfall's team.

Holmes attached a proposed opt-in notice to her conditional certification motion. (*See* ECF #40-1.)  In Defendants' briefs opposing Holmes' motion, they raised various objections to the notice.  The Court has reviewed those objections and concludes that they are without merit.  Holmes may send an opt-in notice to the

21

limited collective identified above that substantially confirms to the proposed notice attached to her motion. To the extent necessary, Defendants shall provide counsel for Holmes with the last known mailing addresses and email addresses of the agents at the Hampton facility who worked for either supervisor Price or Wigfall during the past three years.

Finally, at the hearing on Holmes' motion, counsel for both parties agreed that after the Court resolved the conditional certification motion, it should stay this action pending future decisions of the United States Court of Appeals for the Sixth Circuit and the United States Supreme Court in the cases identified in the footnote below.[7] The Court agrees that a stay of this action pending the resolution of those decisions is appropriate.

Accordingly, for the reasons stated above, **IT IS HEREBY ORDERED** that:

- Holmes conditional certification motion (ECF #40) is **GRANTED IN PART AND DENIED IN PART** as set forth above. The collective is defined as all current and former hourly call-center agents who worked for the Defendants at the Hampton facility under supervisors Price or Wigfall at any time during the past three years.

---

[7] *Epic Systems Corp. v. Lewis*, Supreme Court Case No. 15-2997; *Ernst & Young v. Morris*, Supreme Court Case No. 16-300; *NLRB v. Murphy Oil USA, Inc.*, Supreme Court Case No. 16-307; *Gaffers v. Kelly Services, Inc.*, Sixth Circuit Case No. 16-2210.

- Within ten days of the date of this Opinion and Order, Defendants shall provide counsel for Holmes the last known mailing and email addresses of those employees in the collective defined above.

- Holmes may send an opt-in notice to members of the collective defined above that substantially conforms to the notice attached to her motion (*see* ECF #40-1.)  Potential "opt-in" plaintiffs shall have sixty days from the date of this Opinion and Order to return the opt-in notice and join the collective.

- At the expiration of the sixty-day opt-in period, this action shall be **STAYED** pending the decisions of the United States Court of Appeals for the Sixth Circuit and the United States Supreme Court cited in footnote seven above.  Once those decisions are issued, the Court will set a telephonic status conference with the parties to discuss next steps in this action.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  August 7, 2017                    UNITED STATES DISTRICT JUDGE

     I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 7, 2017, by electronic means and/or ordinary mail.

                      s/Holly A. Monda
                      Case Manager
                      (810) 341-9764